186

PITTSBURGH HOTELS ASSOCIATION, INC., a Pennsylvania Corporation; Carlton Hotel Corporation, a Pennsylvania Corporation; Hilton Hotels Corporation, a Delaware Corporation; Allegheny Hotel Corporation, a Pennsylvania Corporation; Pittsburgher Hotel Company, a Pennsylvania Corporation; and Sheraton Mid-Continent Corporation, a Delaware Corporation, Appellants,

v.

The URBAN REDEVELOPMENT AUTHORITY OF PITTSBURGH, a Pennsylvania Corporation, and Leon Falk, Jr., Joseph S. Wohl and Golden Triangle Motor Hotel, Inc., a Pennsylvania Corporation, and the City of Pittsburgh, Pennsylvania, Appellees.

No. 14014.

United States Court of Appeals
Third Circuit.

Argued June 22, 1962.

Decided Oct. 22, 1962.

D. Malcolm Anderson, Pittsburgh, Pa., (Donald C. Bush, Pittsburgh, Pa., on the brief), for appellants.

Theodore L. Hazlett, Jr., Pittsburgh, Pa. (John O. Wicks, Jr., Pittsburgh, Pa.,

on the brief), for appellee, Urban Redevelopment Authority of Pittsburgh.

Earl F. Reed, Pittsburgh, Pa. (Louis Caplan, Charles Weiss, Thorp, Reed & Armstrong, Pittsburgh, Pa., on the brief), for appellees, Leon Falk, Jr., Joseph S. Wohl and Golden Triangle Motor Hotel, Inc.

Mead J. Mulvihill, Jr., Pittsburgh, Pa. (David W. Craig, on the brief), for City of Pittsburgh.

Before BIGGS, Chief Judge, and GANEY and SMITH, Circuit Judges.

GANEY, Circuit Judge.

Six plaintiffs, a hotel association and five corporations which own and operate hotels in Pittsburgh, Pennsylvania, brought an action allegedly under the Housing Act of 1949,[1] 63 Stat. 413, as amended, 42 U.S.C.A. § 1441 et seq., to enjoin Golden Triangle Motor Hotel, Inc., from erecting a hotel on a parcel of land in an officially designated redevelopment area in the City of Pittsburgh until that city "has caused to be made a competent independent analysis of the local supply of transient housing and as a result thereof determined that there exists in the area a need for additional units of such housing." The complaint avers that the plaintiffs' hotel business will be adversely affected by the operation of the proposed motor hotel since there is no need now or in the foreseeable future for such a unit in that area. The defendants are the Urban Redevelopment Authority of Pittsburgh ("Authority"), Leon Falk, Jr., Joseph S. Wohl, Golden Triangle Motor Hotel, Inc., and the City of Pittsburgh, Pennsylvania.[2]

On January 3, 1952, a contract between the United States, acting through the Federal Housing Administrator, and the Authority was executed. Under the terms of the contract the United States agreed to make an advancement not to exceed $71,700 to the Authority for the purpose of making surveys and plans in preparation for a redevelopment project in the City of Pittsburgh. Apparently, in accordance with the provisions of the Pennsylvania Urban Redevelopment Law of 1945, P.L. 991, as amended, 35 P.S. § 1701 et seq., the City Planning Commission of Pittsburgh completed a plan dated June 7, 1955, for the proposed redevelopment of an area in the Lower Hill district of the City. The area encompasses 46 city blocks and the project is designated as the Lower Hill Redevelopment Project, Redevelopment Area No. 3 ("Project"). The Plan divides the land into commercial, cultural, recreational, educational, residential, parking and open area, and designates the location of streets. Parcel "B" on the Plan contains approximately 5.3 acres abutting Fifth Avenue and Liberty Crosstown Thorofare. This parcel is designated for commercial use and had four streets running across it. One of them is named Chatham Street which was 60 feet wide and was to be used as a public thoroughfare.

The Plan contains a provision that the redeveloper shall devote the land to uses specified in the Plan for such area. The word "Hotel" is listed under the permitted buildings to be erected in the area designated as commercial.[3] Another provision limits the height of any building or structure to be constructed thereon to two stories or twenty feet. Part J of the Plan provides that "This Plan may be modified at any time upon approval of such modification by the Council of the City of Pittsburgh, the City Planning Commission of the City of Pittsburgh and the Urban Redevelopment Authority of Pittsburgh * * *." The Plan was approved by Council of the City of Pittsburgh on July 13, 1955, by Ordinance No. 255.

On August 2, 1954, the Housing Act of 1949 was amended by the Housing Act

---

1. This statute was enacted to permit the Federal government to make grants and loans to aid municipalities in slum clearance and community redevelopment.

2. Diversity of citizenship does not exist between all of the plaintiffs and all of the defendants.

3. Part F. 2b(2) (a) of the Redevelopment Area Plan for Redevelopment Area #3.

of 1954, 68 Stat. 590, which authorized the establishment of an urban renewal fund and the grant of monies from that fund for certain specific purposes in accordance with the laws involved and the regulations of the Federal Housing Administrator. Section 312 of that Act, 68 Stat. 629, 42 U.S.C.A. § 1450 note, provides that the Administrator "with respect to any project covered by any Federal aid contract executed, or prior approval granted, by him under said title I before the effective date of this Act, upon request of the local public agency, shall continue to extend financial assistance for the completion of such project in accordance with the provisions of said title I in force immediately prior to the effective date of this Act."

On October 11, 1955, the Authority entered into a grant and loan Contract with the United States. The Contract sets forth that "The purpose of the contract is to provide for the extension by the federal government to the Authority of financial assistance under the Housing Act of 1949, as amended prior to the enactment of the Housing Act of 1954, with respect to the project", and states the terms and conditions upon which such assistance will be extended and the understandings of the parties to the Contract as to the manner in which they contemplate that the Project will be undertaken and carried out. The Contract also provides that the Plan was satisfactory to the Federal Government, and recognized that amendments to the Plan would be made from time to time in conformity with applicable law and the provisions of the Contract, and that the Federal Government agrees to grant and loan money to the Authority to enable it to make Project land available for redevelopment for uses in accordance with the Plan. From time to time there were a number of waivers and amendments to the Contract, and several modifications to the Plan.

Amendments were made to both the Housing Act of 1949 and 1954 by the Act of September 23, 1959, 73 Stat. 654, known as the Housing Act of 1959. Section 410 of that Act, 42 U.S.C.A. § 1456 (g), amended § 106 of the Housing Act of 1949, 63 Stat. 413, by adding the following subsection:

"(g) No provision permitting the new construction of hotels or other housing for transient use in the redevelopment of any urban renewal area under this subchapter shall be included in the urban renewal plan unless the community in which the project is located, under regulations prescribed by the Administrator, has caused to be made a competent independent analysis of the local supply of transient housing and as a result thereof has determined that there exists in the area a need for additional units of such housing." [4]

By Modification No. 2, approved by Council of the City of Pittsburgh on September 27, 1960, Chatham Street was removed from Parcel "B" of the Plan.

In November of 1960, Leon Falk, Jr., and Joseph S. Wohl, private redevelopers, made a proposal to the Authority for a six month option to enter into a 99 year lease for the purpose of redeveloping Parcel "B" "with an eight-story motor hotel in excess of twenty feet in height." Later Falk and Wohl formed a corporation known as Golden Triangle Motor Hotel, Inc., for the purpose of exercising the option and developing the parcel of land in question. On June 8, 1961, a six month option contract was signed by the Authority and Golden Triangle Motor Hotel, Inc. The Federal Government has approved the proposed redevelopment of Parcel "B" by means of the construction of the motor hotel. Neither the City of Pittsburgh nor the Authority has caused to be made an independent analysis or a survey of the local existence of transient housing facilities for the purpose of determining the need for the proposed motor hotel.

4. Prior to this addition, there was no provision in the law requiring a preliminary survey with regard to urban renewal plans.

On July 31, 1961, the six plaintiffs brought the action here involved. The above option was to have expired in November of 1961, but repeated extensions necessitated by the litigation have been granted. The Federal Government has consented to the extensions. On September 7, 1961, defendants moved for summary judgment on the grounds that (1) plaintiffs had no standing to maintain the action, (2) that the statute relied upon by plaintiffs was not applicable, and if it were, that statute could not be applied constitutionally to this project. After a number of hearings, the District Court for the Western District of Pennsylvania on February 14, 1962, ordered that summary judgment be entered in favor of defendants and that the complaint be dismissed. 202 F.Supp. 486. From this order plaintiffs have appealed.

 We agree that the dismissal of the complaint was proper. The Housing Act of 1949, as amended prior to the effective date of the Housing Act of 1959, did not give the plaintiffs standing to sue in this action.[5] Taft Hotel Corporation v. Housing and Home Finance Agency,

162 F.Supp. 538 (D.C.Conn.1958), aff'd. per curiam 262 F.2d 307 (C.A.2, 1958); Gart v. Cole, 166 F.Supp. 129 (D.C.S.D. N.Y.1958), aff'd 263 F.2d 244, 250 (C.A. 2, 1958). Nevertheless, plaintiffs maintain that subsection (g) of § 410 of the Housing Act of 1959, 42 U.S.C.A. § 1456 (g), by implication, if not in terms, gives them a standing to sue for the matters averred in the complaint. On the other hand, defendants argue that we need not consider the effect of that subsection because, as allowed by § 312 of the Housing Act of 1954, the Authority requested the Administrator to continue to extend financial assistance in accordance with the provisions of the laws in force immediately prior to August 2, 1954, and hence the Authority is not governed by and need not comply with the 1959 amendments. Even assuming that the granting of advancements for the preparation of the Plan amounted to "prior approval granted." by the Administrator under § 312 of the 1954 Act, we need not rule whether such prior approval and the request by the Authority had the effect claimed by defendants,[6] because subsec-

5. Section 9 of the Pennsylvania Urban Redevelopment Law, 35 P.S. § 1709, provides: "An Authority shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof, which powers shall include all powers necessary or appropriate to carry out and effectuate the purpose and provisions of this act * * *:". Despite this broad language, the Supreme Court of Pennsylvania has ruled that: "The Redevelopment Authorities are purely administrative bodies enjoying no important power which is not subject to the approval of the city council or the county commissioners; the Authorities cannot independently exercise any municipal functions. Moreover they are public bodies and not special commissions or private corporations within the meaning of the constitutional prohibition [of the Commonwealth]." See Belovsky v. Redevelopment Authority of Philadelphia et al., 357 Pa. 329, 343, 54 A.2d 277, 172 A.L.R. 953 (1947).

One of the items listed under § 9 as subsection (q) is "To sue and be sued." But giving consent to be sued does not confer jurisdiction upon a Federal district

court over a controversy involving the Authority.

Plaintiffs do not claim that the Housing Act of 1949, as amended, is unconstitutional. They do not seek to restrain the enforcement of a Pennsylvania statute as being unconstitutional on its face (which would have required the convening of a three-judge statutory court), or seek to restrain the action of State officers who are enforcing a State statute in an unconstitutional manner. Nor do they assert that the enforcement of State law deprives them of due process of law or denies them the equal protection of the laws.

6. Prior to its final passage, the proposed amendments had contained a provision directing the Federal Housing Administrator to amend existing contracts between the Government and the local urban renewal authorities in order to bring such contracts into conformity with changes set forth in the proposed amendments. Since the Committee on Banking and Currency understood that existing law permitted those contracts to be amended to incorporate the provisions of

tion (g) of § 410 does not, in our opinion, give plaintiffs a standing to sue in the action here involved. However, even if it did so, the subsection, by its terms, does not require that a survey be made before the proposed hotel may be built on that plot of ground designated as Parcel "B" on the Plan. The subsection does not prevent all future new construction of hotels or other housing for transient use unless a survey is made. It simply provides that *no provision* permitting such construction shall be included in the *urban renewal plan* unless it is determined that there is a need for such construction after an independent survey of the local supply has been made. Although the subsection requiring a survey does not specifically restrict the words "no provision" to future ones only, and it might be wise to employ the safeguard of that subsection here, in the absence of reliable indicia showing a Congressional intent that the words include past approved ones, the subsection is not to be applied retroactively, that is applied to urban renewal plans containing a provision permitting the construction of a transient housing unit which had been approved before the effective date of the 1959 Act. This is the usual statutory interpretation. See Peony Park v. O'Malley, 223 F.2d 668, 671–672 (C.A.8, 1955), cert. den. 350 U.S. 845, 76 S.Ct. 87, 100 L.Ed. 753. The requirement of a survey and a determination of the need for such transient housing unit applies only to urban renewal plans having no provision for that unit which had been approved prior to the effective date of the 1959 Act. Here, there is such a provision in the urban renewal Plan officially approved on October 11, 1955. This was almost 4 years before the effective date of the Housing Act of 1959.

Plaintiffs point out that under this interpretation of subsection (g) a hotel can be built, as may be the case here, many years after the approval of the original plan when the need for such unit will be much less than it was when the provision was approved. Conceding this to be a possibility it is also possible that the need may become greater. Additionally, a radical change in the facts developed by the survey may take place even if plaintiff's interpretation were to be the accepted one. Even though, after a survey, a determination is reached that there is need for a hotel, between the time of that determination and the actual operation of that housing unit, the need for it may likewise disappear. Moreover, as time passes, the eventuality similar to that which the plaintiffs seek to prevent here will vanish. We think Congress was aware of this eventuality when it wrote subsection (g).[7]

That the Plan regarding Parcel "B" was changed after the effective date of the 1959 Act by the removal of a street upon which no structure was permissible and that the height of the proposed hotel will violate a restriction set forth in the Plan does not nullify the fact that a provision permitting the construction of a hotel existed prior to the effective date of the 1959 Act. Of course, any change, no matter how slight, in the Plan is *pro tanto* a modification of the Plan. But the paragraph allowing modification of the Plan at any time is part of the provision permitting the use of the land by the construction of a hotel thereon. A point

the proposed Act, the above proposed provision was deleted. See S.Rep. No. 924, Sept. 8, 1959, 86th Cong., 1st Sess., 1959 U.S.Code Cong. and Adm.News, p. 2846. Moreover, on this point the Federal Housing Administrator should be heard, but he is not a party to the action.

7. In the fall of 1957, the Subcommittee on Housing held extensive hearings in many parts of the country to develop information regarding urban renewal and low-rent housing programs. The Senate Re-

port to the proposed legislation concerning the Housing Act of 1959 states: "During consideration of housing legislation in 1957, many members of the committee became alert to the need for projecting Federal participation in both those programs into future years on a sustained and predictable basis, and with emphasis upon *local* responsibility and autonomy." (Italics supplied.) See S. Rep. No. 924, 86th Cong., 1st Sess. (Sept. 8, 1959), 1959 U.S.Code Cong. and Adm. News, p. 2845.

may be reached where a modification of a provision will be such as to change the provision into a new one. The changing of land marked for residential use to commercial might be one example. At what point the transition occurs we need not determine here. Suffice it to say that we think that the removal of Chatham Street and the structural height restriction did not change the provision of the Plan into a new one.

The order dismissing the complaint will be affirmed.